Filed 2/13/25  Mallon v. Hologic CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| VICTORIA MALLON,<br><br>  Plaintiff and Appellant,<br><br>v.<br><br>HOLOGIC, INC.,<br><br>  Defendant and Respondent. | H050917, H051465<br>(Santa Clara County<br> Super. Ct. No. 18CV326938) |

Appellant Victoria Mallon sued her former employer, Hologic, Inc. (Hologic), alleging among other claims that Hologic engaged in unlawful retaliation under Labor Code[1] section 1102.5 after Mallon reported regulatory violations in Hologic's research and development (R&D) department.  Mallon claimed that, after the department head reacted poorly to her protected report, Hologic subjected her to a series of adverse employment actions that culminated in her termination.

The trial court granted summary judgment in favor of Hologic after deciding the evidence failed as a matter of law to support Mallon's whistleblower retaliation and other claims.  The court found that no reasonable trier of fact could conclude Mallon's protected reports were a contributing factor to her eventual termination, which transpired

---

[1] All further unspecified statutory references are to the Labor Code.

more than a year and a half later, and because there was no causal link connecting the alleged chain of adverse employment actions to Mallon's protected acts.

Mallon appeals from the judgment in favor of Hologic and separately appeals the trial court's postjudgment costs award granting Hologic costs for certain parts of the litigation. For the reasons explained below, we decide that Mallon has not established reversible error as to either the summary judgment or cost orders and affirm the judgment.

## I. FACTS AND PROCEDURAL BACKGROUND[2]

*A. Mallon's Employment at Hologic*

### 1. Mallon's Site Manager Role

Hologic designs and manufactures medical devices. In 2006, Mallon was hired as a lab manager at a company acquired by Hologic. Mallon became Hologic's Sunnyvale site lab manager and held the position until 2013, when she was promoted to senior manager in the diagnostics laboratory. Mallon's supervisor was Suzanne Werneke. Mallon received positive performance reviews and pay raises during that time.

Hologic maintains a quality management system that is mandated by federal law[3] and includes an internal audit program. According to company documents, internal site audits are conducted to determine whether Hologic's quality management system " 'is in

---

[2] We draw the facts recited here from the record that was before the trial court when it ruled on the motion for summary judgment (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037 (*Yanowitz*)), including the parties' separate statements of undisputed material facts, evidence judicially noticed in conjunction with the motion for summary judgment, and admissions in the parties' appellate briefs. (See *Kim v. County of Monterey* (2019) 43 Cal.App.5th 312, 316, fn. 1.) We liberally construe the evidence in support of Mallon, as the party opposing summary judgment, and resolve doubts concerning the evidence in her favor. (*Yanowitz*, at p. 1037.)

[3] Federal law requires manufacturers of finished medical devices to establish a quality management system to ensure safe and effective products. (See 21 C.F.R. § 820.1.)

compliance with all applicable regulations, procedures, and standards and is effectively implemented and maintained.' "

Mallon's job duties and responsibilities in her role as the senior manager of the diagnostics laboratory included supporting the quality department "for the purpose of audits, both internal and vendor related" and implementing corporate environmental health and safety guidelines, processes, and protocols for the Sunnyvale office. Mallon performed internal audits as part of this role.

In March 2015, in connection with an internal audit, Mallon identified a potential discrepancy between the qualifications of a new quality engineer, Ricky L.,[4] and Ricky's job description and duties. She communicated her concern to Robert Kielinen, the senior director of corporate quality engineering. Mallon pointed out that a lack of conformity between an engineer's qualifications and job description could violate federal regulations, including title 21 Code of Federal Regulations section 820.25. Although Ricky L. initially declined to provide Mallon with the information she requested, he and Mallon ultimately agreed on a method to verify his qualifications. Mallon deemed the issue "resolved." In an e-mail to Mallon's supervisor Werneke, Kielinen wrote that he "appreciate[d] [Mallon]'s continued support and assistance with the Sunnyvale internal audit process" and found her to be "very conscientious in her approach and very committed to helping us ensure compliance."

The following month, Mallon identified a violation in the product development (also referred to as R&D) department. She reported the violation in an April 2015 audit report as a Tier 1 nonconformance related to the maintenance and documentation of training records in R&D. According to Hologic's internal audit report rating key, a Tier 1 nonconformance represents a failure to comply with an applicable regulation, standard, or procedure. It is the "[m]ost severe" type of nonconformance and requires corrective

---

[4] We refer to certain nonparties by first name and last name initial to protect their privacy interests. (Cal. Rules of Court, rule 8.90(b)(10).)

3

action to prevent recurrence. By contrast, a Tier 2 nonconformance is "[a]n isolated observation that is in conflict with contractual or procedural requirements but does not represent a systemic" compliance failure.

Jerome Lapointe, site leader and head of product development, questioned the identified nonconformance in an e-mail to senior director Kielinen. On April 17, 2015, Lapointe wrote to Kielinen: "Have you seen this? I'm struggling to understand if this is helpful, or poses a risk. Are we following our own procedures by doing this, and I'm not sure why our SDS lab manager [Mallon] is conducting internal audits!" Kielinen responded that he was looking into it and explained to Lapointe that Mallon "has helped with auditing for a number of years now (both internal and supplier)" and he believes Mallon "is committed to performing a thorough audit with the aim of improving compliance." Concurrently, Mallon reported to Kielinen that she was "facing resistance for a Tier 1" nonconformance she had identified in the April 2015 audit, stated that she believed the objective evidence supported the nonconformance observation, and expressed concern that Hologic would be "at regulatory risk" if the nonconformance were to be downgraded.

Kielinen responded to Mallon in an e-mail on April 17, 2015. Kielinen stated that after reviewing the issue, he agreed she had "identified a gap" but believed it did not represent a "systemic failure" so much as a limited one. Kielinen recommended downgrading the observation to Tier 2. In an e-mail response, Mallon reiterated her concern that "there is a failure of the quality system to comply with applicable regulations" and registered her disagreement with the Tier 2 rating. She requested an addendum documenting the change from Tier 1 to Tier 2 be added to the internal audit report "so that the original rating is preserved in the audit history." Kielinen and quality engineer Ricky L. signed an addendum to the April 2015 audit report documenting the reclassification. This incident was the only time between 2012 and 2017 that Hologic's Sunnyvale location downgraded a nonconformance.

4

### 2. Mallon's Transition to Research & Development

In November 2015, Hologic conducted a reorganization. Werneke was promoted to senior director in another group and the individuals that reported to her—including Mallon—began reporting to other people. Hologic transferred Mallon to product development/R&D, to be supervised by Lapointe. Lapointe testified that he "was asked by HR" if he "would absorb [Mallon] into [his] group, and [he] said yes."

In April 2016, Mallon reported to human resources employee Kristen Haisenleder that a new hire, Sonny T., did not have the qualifications for his position as a quality engineer. In a voicemail to Haisenleder, Mallon stated that she had been asked to train a new employee on safety and had "looked him up on LinkedIn, and it appears he has no medical device experience." She reported that a quality engineer without the necessary "scientific background to perform the job" could perpetuate "weaknesses in the quality area and quality assurance and not pick[] up some deficiencies in our own internal quality audits." Mallon did not request a response and explained she was merely giving her "two cents" "to make sure we have a strong team here in quality assurance" because it had "been very difficult." In a further e-mail communication with human resources coordinator Sue Hatch about the scope of safety training Mallon was to provide for Sonny, Hatch stated that she had followed up with Haisenleder regarding Mallon's concerns and had confirmed that Sonny "was interviewed by and approved for hire by" the senior director for quality. Hatch told Mallon that if she has "reason to be concerned about what may come up in terms [of] job descriptions during an audit to please address it directly with the Quality Team."

In a separate e-mail thread between Hologic's human resources director, Stephanie Heller, and Haisenleder regarding Mallon having raised a question about Sonny T.'s qualifications, they agreed it was "a little obnoxious" and "not her role or place to say." Heller noted this was "the issue [Lapointe] is having with her, [she] but[t]s her nose in to

5

things that are not her business" and stated that he "was very frustrated that she felt compelled to 'complain about it' to HR."

Shortly after, on May 11, 2016, Lapointe called a meeting with Mallon and Heller to discuss Mallon's performance goals, behavior, and to clarify her role in R&D (May 11 meeting). According to Lapointe, Mallon had struggled to meet the objectives of her new position within R&D. Lapointe testified that he sought to align Mallon's identification of her performance goals and objectives to product development and away from supporting quality and environmental health and safety. Heller testified that she recalled Mallon was performing tasks that "were no longer necessary based on being part of the bigger organization" and "related to employee health and safety which [were] outside of the scope" of her role.

According to Mallon, Lapointe "attacked" her in the meeting with "numerous false accusations," including that she was "resistant" to change and to taking on R&D assignments, was improperly performing tasks outside the scope of her job duties and not performing enough product development, was ignorant of how product development worked, and was meddling in areas that didn't concern her. Mallon testified that Lapointe and Heller "berated" her during the meeting for doing tasks unrelated to product development and directed her to stop doing "[a]nything other than product development."

On May 13, 2016, Mallon sent an e-mail referencing "[l]etter to [e]mployee [f]ile" to Heller, copying Lapointe, in which she formally responded to the May 11 meeting. Mallon noted the purpose of the May 11 meeting had been to discuss her performance goals and observed Lapointe's apparent concern that she either "was not performing enough R&D-related tasks or . . . was resisting taking on R&D assignments since joining the department." Mallon emphasized her readiness "to take on new tasks, responsibilities, or projects in R&D" and asked Lapointe to "directly communicate his needs" to her, noting she "cannot meet an expectation if it is not mentioned or identified to [her]." Mallon also responded to the feedback that her actions were inappropriate or

6

outside the scope of her job duties. She explained that she believed she was acting within the scope of her responsibilities when she voiced her opinion about the new quality engineer (Sonny T.). Mallon stated that her opinion had been solicited by another R&D department employee who showed her Sonny's resume and asked if she thought his education and experience matched the job needs. She noted that she "currently ha[s] QA [(quality assurance)] department responsibilities including internal auditing, supplier auditing and complaint investigation, as needed." Mallon cited similar issues that had prompted a United States Food and Drug Administration (FDA) warning at another lab in Alameda and stated she had "a great concern that [they] [were] at regulatory risk and as a part-time member of the QA team" felt it was her "responsibility to voice [her] concern." She noted that no one she notified about the nonconformance had suggested that she was overstepping her position. Mallon included references to past performance reviews highlighting Hologic's recognition of her contributions and demonstrating her ability to take on new responsibilities and operate within their scope.

In e-mails following the May 11 meeting, Heller identified to Lapointe the environmental health and safety "activities that [Mallon] is currently working on" in preparation for "mov[ing] [Mallon] toward focusing on her R&D responsibilities." Mallon informed Lapointe that she had her "preliminary revised performance goals laid out based on" their meeting and confirmed that she understood her "QA internal auditing" responsibilities had been "completely transferred" but sought clarification regarding her environmental health and safety duties. Lapointe and Heller directed her to stop any work that was not related to product development, even though her job description (which identified duties in quality audit and environmental health and safety) remained the same as when she worked for Werneke's team. With the transfer of her quality and environmental health and safety duties, Mallon felt she "was just being isolated with only [Lapointe] controlling [her] interaction . . . within the company."

In late May 2016, Heller (who was not based in Sunnyvale) created an organizational assessment for her own use and to familiarize herself with her "new client area"—i.e., Hologic's Sunnyvale employees. Heller noted, based on feedback from Lapointe, that Mallon " 'doesn't integrate well.' "

When Lapointe completed Mallon's fiscal year 2016 performance review, he provided a numeric rating of 3.45 out of 5 for "[m]eets [e]xpectations" but left blank the section of the form pertaining to outcomes and impact versus goals. In the appraisal summary comments, Lapointe wrote, "This year, [Mallon] was asked to transition her responsibilities to [p]roduct [d]evelopment. [Mallon]'s background as manager of the Sunnyvale Diagnostic Services laboratory, experience in clinical laboratory environment and regulations, and customer interactions . . . will provide [p]roduct [d]evelopment with invaluable customer perspective not only during development, but also during initial launch and sustained customer support phases. . . . [Mallon] also supported EHS [environmental health & safety], internal audits, and represented Hologic in community activities this year, representing her eagerness to contribute and willingness to do whatever is needed at any time. Next year we look forward to integrating [Mallon] and her team even more closely into traditional development activities."

At his deposition, Lapointe stated this was "a very good rating" but agreed that in 20 years of writing performance reviews, there was no other employee at Hologic for whom he had failed to provide information in the "[o]utcomes and [i]mpact" section of the performance review.

According to Mallon, throughout 2016 and 2017, Lapointe and his direct report, Lina Baydoun, excluded her from key meetings and denied her "critical information" about one of the projects assigned to her (the "SCUBA" project). In February 2016, Baydoun sent Mallon meeting notes from a meeting on SCUBA, though Mallon had not been included among the meeting attendees. In a January 2017 e-mail to Baydoun, Mallon outlined the information she had been given regarding her "new projects and

8

goals" and requested "any background information needed to successfully carry out project tasks correctly and efficiently." Mallon noted that her inclusion in SCUBA activities, specifically, had been "negligible" until November 2016, leaving her "feel[ing] very ignorant in this area."

In January 2017, Lapointe reassigned Mallon to report directly to Baydoun. When Lapointe proposed the transition to Heller, he expressed that he did not have the time "to manage [Mallon] on a daily basis" and wondered if they "might consider changing the reporting structure." Lapointe noted that Mallon would "benefit by reporting to [Baydoun]" though he was "not sure if [Mallon] would see it that way." In the e-mail communication with human resources confirming the change, Lapointe stated that Mallon was "in need of day to day management, translation of goals to actionable tasks, and close oversight of activities as her perspective of output which meets [product development] needs are not accurate." According to Mallon, Baydoun departed from the practice of other managers at Hologic by not scheduling regular one-on-one meetings with Mallon and by frequently excluding Mallon from meetings and failing to ensure she received all necessary training.

On February 7, 2017, Mallon, Lapointe, and Heller met to discuss Mallon's performance appraisal and her transition to Baydoun's supervision. Mallon's handwritten notes from the meeting reflected comments by Heller implying that Mallon was "difficult to satisfy" because she sought more detail in her performance review and by Heller and Lapointe suggesting Mallon did not know how R&D worked. Mallon raised the concern that she was not given direction on SCUBA and had asked for updates and inclusion multiple times by e-mail. She noted that Heller believed the transition to Baydoun would be a "better fit," and Mallon had agreed she was "getting the information and direction [she] needed." Mallon also noted that Heller had mentioned that if Mallon "had further difficulties and we had to talk again this would be considered a 'pattern.' "

9

When Mallon remarked that the word " 'pattern' " alarmed her, Heller told her not to be alarmed.

### 3. Mallon's Termination from Hologic

Over the next several months, Mallon did not meet Baydoun's expectations for her R&D job duties. Baydoun testified that Mallon's experience in clinical labs, customer service, and auditing still left "a huge learning curve" for the technical lab work specific to Baydoun's team. Mallon "had a lot of knowledge but not related to" the team's work. In September 2017, Mallon requested but was denied a pay raise. Baydoun informed Heller it was "not quite working out" to have Mallon under her supervision. Baydoun also told Lapointe that she could not manage Mallon anymore.

By early October 2017, Lapointe, Heller, and Baydoun began discussing the possible elimination of Mallon's position, which Heller suggested was "not clearly needed." Lapointe and Baydoun inquired about reassigning Mallon outside of R&D, and Heller informed them (after obtaining input from Lapointe's boss and senior vice president of R&D at the San Diego office, Brad Blake) that a reassignment was not possible. Lapointe, Heller, and Baydoun made a "consensus decision" to eliminate Mallon's position. Heller testified that, unlike a "performance separation," "position elimination" at Hologic is not performance related.

On November 2, 2017, Heller and Baydoun informed Mallon that her position at Hologic was being eliminated. Mallon's position was not subsequently filled. Hologic did not replace any employees in the Sunnyvale R&D department starting in July 2015 due to a planned closure of the Sunnyvale facility, which began in 2020 and was completed in June 2021.

### B. Mallon's Employment Discrimination and Retaliation Action

### 1. Operative Complaint

In April 2018, Mallon filed suit against Hologic and Lapointe, asserting seven causes of action, including for gender and age discrimination, retaliation in violation of

10

the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.), retaliation in violation of Labor Code section 1102.5, harassment, slander, and libel. In May 2020, Mallon filed a first amended complaint asserting the same causes of action.

In September 2022, pursuant to a joint stipulation of the parties, Mallon dismissed with prejudice all of the causes of action against Lapointe and the FEHA-based causes of action against Hologic. The dismissed claims included, respectively, Mallon's first, second, third, and fifth causes of action for gender and age discrimination, failure to prevent and correct discrimination and harassment, retaliation under FEHA, and harassment under FEHA. The remaining claims consisted of Mallon's fourth, sixth, and seventh causes of action against Hologic, respectively, for retaliation in violation of section 1102.5, slander, and libel. The stipulation also provided that Mallon could amend her claims, contingent on the trial court granting a pending motion for leave to amend, and to add an eighth cause of action against Hologic for wrongful termination in violation of public policy.

The joint stipulation further provided that neither party would be considered the " 'prevailing party' " with respect to the dismissed claims and that "[a]ny 'prevailing party' determination, and any award of fees and/or costs based thereon, shall be made based on only the remaining claims" for retaliation (§ 1102.5), slander, libel, and wrongful termination in violation of public policy. On September 30, 2022, the trial court filed an order granting the joint stipulation. Mallon thereafter filed the operative second amended complaint (complaint), asserting the remaining claims of retaliation in violation of section 1102.5, slander, libel, and an eighth cause of action against Hologic for wrongful termination in violation of public policy.

The complaint alleged that Lapointe, as a senior director for Hologic and manager of Hologic's Sunnyvale site employing approximately 30 employees, was a managing agent of Hologic vested with substantial discretionary authority over personnel and staffing decisions. It alleged that at the time of her hiring, Mallon had over 20 years of

11

relevant experience in the medical device industry and performed FDA QSR (21 C.F.R. § 820) and ISO 13485 quality audits[5] of Hologic's operations, documentation, and personnel. It alleged that she excelled in her work until Lapointe began bullying, harassing, and discriminating against her after she reported violations in the R&D department. Mallon alleged that after identifying nonconformances and possible violations of federal laws, and because she "complained to Hologic's leadership, including senior [h]uman [r]esources personnel, of the hostile, abusive, and retaliatory behavior of Lapointe," Hologic subjected her to "a litany of wrongful conduct." She alleged retaliation under section 1102.5, "including verbal insults, eliminating many of [her] job duties, reducing her responsibilities, subjecting her to increased scrutiny and criticism, falsely and publicly criticizing [her] work ethic and performance, excluding her from meetings with Lapointe and other senior R&D employees, withholding key information from [her] to enable her to perform her job duties, preventing her from taking on new projects and duties, and eventually terminating her." In addition to her prayer for damages, Mallon sought exemplary and punitive damages. In its answer, Hologic generally denied the allegations in the complaint and asserted affirmative defenses.

### 2. Motion for Summary Judgment

On November 17, 2022, Hologic moved for summary judgment as to all of Mallon's remaining non-FEHA causes of action, or in the alternative, summary adjudication as to the fourth (whistleblower retaliation), sixth (slander), seventh (libel), and eighth (wrongful termination in violation of public policy) causes of action, as well as to Mallon's prayer for punitive damages (motion). Mallon opposed the motion, and after considering the parties' respective arguments and evidence, the trial court granted

---

[5] "FDA QSR" refers to good manufacturing practices regulations set forth in the quality system regulation ("QSR") established under the Federal Food, Drug, and Cosmetic Act. (See 21 C.F.R. § 820.3(a).) "ISO 13485" refers to an international standard that specifies the requirements a medical device corporation must have for its quality management system.

the motion in full. We summarize only those aspects of the motion, opposition, and ruling relevant to our analysis on appeal.[6]

In its motion, Hologic asserted that the cause of action for whistleblower retaliation failed as a matter of law because there was no evidence that Mallon's alleged protected activity was a "contributing factor" in any adverse employment action. Hologic argued that Mallon's cause of action for wrongful termination in violation of public policy likewise failed because she could not prove the underlying claim for retaliation. Hologic also maintained that Mallon could not prove her claim for punitive damages because she failed to proffer clear and convincing evidence of malice, oppression, or fraud, or to show that any such oppressive conduct was attributable to Hologic.

In support of the motion, Hologic included its memorandum of points and authorities, its separate statement of undisputed material facts (separate statement), the declarations of Lapointe, Baydoun, Heller, and Hologic's person most knowledgeable Carmen Bibel, and the declaration of Hologic's counsel Stacey James containing exhibits, including the deposition testimony of Lapointe, Heller, and Mallon, and other documentary evidence. Hologic asserted there was no evidence that Mallon's alleged protected acts, each of which involved her reporting a violation or internal audit nonconformance between 18 months to three years before the termination of her employment, were factors in any of the alleged retaliatory acts against her. Hologic maintained that it had legitimate reasons to eliminate Mallon's position, regardless of

---

[6] Mallon challenges the trial court's grant of summary judgment only as to the fourth and eighth causes of action for whistleblower retaliation and wrongful termination in favor of public policy, as well as with respect to the claim for punitive damages. Mallon does not challenge the court's ruling as it pertains to her defamation claims. Thus, of the four causes of action that remained in the case following the joint stipulation, only retaliation and wrongful termination are at issue before this court.

13

whether she engaged in alleged protected activity, because she struggled to transition to the R&D department and there was no other department to which she could transfer.

Mallon opposed the motion on procedural and substantive grounds.

In its tentative opinion, the trial court requested argument on several issues, including the relevance of the length of time between any protected activity and termination.

In a lengthy written order, the trial court granted the motion for summary judgment. It took judicial notice of the FDA inspection records and federal regulation requested by Mallon but declined to consider either party's evidentiary objections based on improper formatting. (Citing Evid. Code, § 452, subds. (b), (h); Cal. Rules of Court, rule 3.1354; *Vineyard Springs Estates v. Superior Court* (2004) 120 Cal.App.4th 633, 642 (*Vineyard Springs*).) It agreed with Mallon that the motion was procedurally noncompliant due to improper formatting of Hologic's separate statement but found that the defect did not preclude Mallon from filing opposition on the merits and declined to deny the motion on that basis.

With respect to Mallon's fourth cause of action for retaliation, the trial court relied on the California Supreme Court's decision in *Lawson v. PPG Architectural Finishes, Inc.* (2022) 12 Cal.5th 703 (*Lawson*), which clarified the framework governing whistleblower retaliation claims under section 1102.5. The trial court found that Mallon's three instances of alleged whistleblower activity (reporting the Ricky L., Sonny T., and R&D training record violations) qualified as "protected activity" under section 1102.5. Nevertheless, the court found "no evidence" that any one of the three events was a contributing factor to Mallon's eventual termination. It further found that many of the 14 events alleged by Mallon to comprise a "long chain" of adverse employment actions[7]

---

[7] In her opposition to the summary judgment motion, Mallon asserted that Hologic engaged in at least 14 adverse employment actions against her immediately following her

14

were not directed at Mallon and "cannot be viewed as a matter of law as activity impacting [her] employment prospects," while "still others are the same incident alleged in two different ways."  The court found that, even viewed in the light most favorable to Mallon and considered as a whole, the 14 incidents did not "as a matter of law" form a chain linking the protected activity to Mallon's termination.  The court concluded that "no reasonable jury could conclude that [Mallon] was terminated as a result of protect[ed] activity she engaged in [three], [two], and [one and one-half] years earlier, and her retaliation claim fails."

The trial court also granted summary adjudication as to the eighth cause of action for wrongful termination in violation of public policy because the alleged violation of public policy depended on Mallon's underlying whistleblower retaliation claim.  It further found that Mallon's claim for punitive damages "falls away" in the absence of any remaining causes of action.  Independent of the other causes of action, the court found that Mallon could not prove her claim for punitive damages because neither Lapointe, Heller, nor Baydoun were officers, directors, or managing agents of the corporation, and Mallon had not shown that any of them exercised substantial discretionary authority over decisions of corporate policy as needed to impute alleged malice to Hologic.

protected April 2015 report.  Mallon identified these adverse actions as:  gaslighting and falsely criticizing her by accusing her of violating " 'procedures,' " acting outside the scope of her lab manager role, and " 'posing a risk' " to Hologic; failing to fully investigate and take corrective action on her reports of violations despite being required to do so by company policy; downgrading her reported [t]ier 1 nonconformance; removing her key job duties in environmental health and safety and quality audit; attacking her April 2016 report of an unqualified engineer by calling her " 'obnoxious' " and stating she " 'butts her nose' " into other business; failing to complete her [fiscal year] 2016 performance review; subjecting her to increased scrutiny and discipline; excluding her from meetings and withholding information necessary for her to fulfill her job duties; demoting her by moving her direct report from Lapointe to Baydoun; threatening that further complaints from her " 'would be considered a pattern' " (underscoring omitted); denying her pay raise request; and terminating her.

On March 28, 2023, the trial court entered judgment in favor of Hologic. This appeal followed.

### 3. Motion to Strike or Tax Costs

After entry of judgment, Hologic filed a memorandum of costs seeking $86,199.13. Mallon moved to strike or, alternatively, to tax costs (costs motion).

Mallon's costs motion asked the trial court to strike the requested costs on the ground that a prevailing defendant in a FEHA case—including in which there are non-FEHA causes of action asserted—is not entitled to recover costs absent a finding that the plaintiff's claims were frivolous. (See Gov. Code, § 12965, subd. (c)(6), hereafter Government Code section 12965(c)(6).) Mallon asserted there was no finding that her FEHA-based discrimination and harassment claims were frivolous, and although she voluntarily dismissed her FEHA claims, the remaining claims were "inextricably linked to the FEHA claims" and Hologic could not show costs were incurred solely in defending the non-FEHA claims. Alternatively, Mallon asked the court to limit any costs award to reasonable costs only for the period of litigation following dismissal of the FEHA claims.

Hologic opposed the costs motion and submitted additional evidence to substantiate its requested costs. Mallon's reply maintained that Hologic failed to show any entitlement to costs. We describe the arguments asserted in the moving and opposing papers in more detail in our analysis, *post* (pt. II.B.1.).

After briefing and oral argument, the trial court issued a written order granting in part Mallon's costs motion. The court granted the motion as to those costs incurred before September 15, 2022, when Mallon voluntarily dismissed her FEHA claims, finding that Mallon's FEHA claims were not frivolous when brought and that litigation of the non-FEHA claims during that period did not increase Hologic's costs. As to those costs incurred after September 15, 2022, the court found that the FEHA exception to awarding costs to a prevailing defendant did not apply after the FEHA claims were dismissed and that Hologic's claimed costs for that period were reasonable and

16

reasonably necessary. The court granted Mallon's motion to strike as to costs Hologic incurred before September 15, 2022, and denied the motion as to $25,615.29 in litigation costs Hologic incurred after that date.

Mallon appealed from the postjudgment order on her costs motion. This court ordered both appeals be considered together for purposes of record preparation, briefing, oral argument, and disposition.

## II. DISCUSSION

Mallon challenges the judgment on several grounds. Mallon asks this court to rule on her evidentiary objections to the summary judgment motion, argues that the trial court should have denied the motion on procedural grounds, and contends the court erred in granting summary judgment on her section 1102.5 retaliation claim because there are triable issues of fact. Mallon further contends that the court erred in deciding the derivative wrongful termination and punitive damages claims. Alternatively, if this court upholds the summary judgment, Mallon maintains the costs award must be reversed due to the intertwined nature of the FEHA and non-FEHA claims and legislative policy of encouraging potentially meritorious FEHA claims.

Hologic disputes Mallon's contentions of error.

### A. Summary Judgment

#### 1. Legal Principles and Standard of Review

Whether the trial court erred in granting a defendant's motion for summary judgment is a question of law we review de novo. (*Samara v. Matar* (2018) 5 Cal.5th 322, 338.) Summary judgment is warranted where there are no triable issues of material fact, and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) When reviewing an appeal after a motion for summary judgment has been granted, "we conduct the same procedure employed by the trial court. We examine (1) the pleadings to determine the elements of the claim, (2) the motion to determine if it establishes facts justifying judgment in the moving party's favor, and (3) the

17

opposition—assuming movant has met its initial burden—to 'decide whether the opposing party has demonstrated the existence of a triable, material fact issue.' " (*Oakland Raiders v. National Football League* (2005) 131 Cal.App.4th 621, 630 (*Oakland Raiders*).) In examining the record, we view the evidence in the light most favorable to the plaintiff as the losing party and resolve any evidentiary doubts or ambiguities in her favor. (*Bailey v. San Francisco Dist. Attorney's Office* (2024) 16 Cal.5th 611, 620 (*Bailey*).)

Hologic, as the party moving for summary judgment, bears the burden of persuasion "from commencement to conclusion" of the motion that there is no triable issue of material fact and that it is entitled to judgment as a matter of law. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).) To meet its persuasive burden, the party requesting summary judgment has an initial burden of demonstrating that a cause of action lacks merit because one or more elements of the cause of action cannot be established or there is a complete defense to that cause of action. (Code Civ. Proc., § 437c, subd. (*o*); *Aguilar*, at p. 850.) If the moving party makes a prima facie showing that justifies judgment in its favor, the burden shifts to the opposing party to make a prima facie showing of the existence of a triable issue of material fact as to the cause of action. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, at p. 849.)

In determining whether the parties have met their respective burdens, we " 'consider[] all the evidence set forth in the moving and opposition papers except that to which objections were made and sustained.' " (*State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1035.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar*, *supra*, 25 Cal.4th at p. 850.) "A party cannot avoid summary judgment by asserting facts based on mere speculation and conjecture, but instead must produce

18

admissible evidence raising a triable issue of fact." (*LaChapelle v. Toyota Motor Credit Corp.* (2002) 102 Cal.App.4th 977, 981.)

### 2. Procedural and Evidentiary Objections

We begin by addressing Mallon's procedural and evidentiary objections to Hologic's summary judgment motion. Mallon contends, as she did in the trial court, that the motion should have been denied on procedural grounds because Hologic's separate statement contains legal conclusions and arguments, is improperly formatted, and fails to cite to evidence as required by California Rules of Court,[8] rule 3.1350(d)(3). Mallon also contends that this court should sustain the evidentiary objections that she raised in her opposition and the trial court declined to address. Hologic responds that the trial court properly exercised its discretion in both instances. It further asserts that Mallon has forfeited any argument as to the merits of the evidentiary objections since the trial court declined to rule on those objections on other grounds, which Mallon has not challenged on appeal.

### a. Separate Statement

A motion for summary judgment must include a separate statement "setting forth plainly and concisely all material facts that the moving party contends are undisputed," each of which "shall be followed by a reference to the supporting evidence." (Code Civ. Proc., § 437c, subd. (b)(1).) Noncompliance with the "requirement of a separate statement may in the court's discretion constitute a sufficient ground for denying the motion." (*Ibid*.) Rule 3.1350(d) specifies the components and formatting requirements for the separate statement, including that it identify "[e]ach supporting material fact claimed to be without dispute with respect to the cause of action" (rule 3.1350(d)(1)(B)) and appear in a specified "two-column format" with the undisputed material fact and citation to supporting evidence in the first column (rule 3.1350(d)(3)). Further,

---

[8] All further unspecified rule references are to the California Rules of Court.

19

"[c]itation to the evidence in support of each material fact must include reference to the exhibit, title, page, and line numbers" (*ibid.*).

Hologic placed its citation to supporting evidence in the second column of its separate statement (which should have been left blank for Mallon's response) and so failed to comply with rule 3.1350(d)(3). The trial court noted that Hologic's separate statement also "at times" did not cite evidence by " 'the exhibit, title, page, and line numbers' " as required. Although the court found this noncompliance created "an unnecessary burden for both the [c]ourt and [p]laintiff," it decided the separate statement was not "so procedurally defective as to warrant denial of the motion on that basis" and that the procedural defects "did not preclude [p]laintiff from filing an opposition on the merits." The court did not expressly address Mallon's claim that the separate statement improperly sought to introduce legal conclusions as "material fact[s]."

We decide that Mallon has not demonstrated an abuse of discretion in the trial court's treatment of the separate statement. Mallon complains that Hologic's formatting mistake caused her to spend time and resources to fix the error by cutting and pasting Hologic's supporting evidence for each undisputed fact from the second column into the first and asserts that the failure to cite the title of each exhibit "imped[ed]" the trial court's ability to determine whether the case presented triable issues of material fact and "obscur[ed] the evidence." But the "power to deny summary judgment on the basis of failure to comply with [] rule 3.1350 is discretionary, not mandatory." (*Truong v. Glasser* (2009) 181 Cal.App.4th 102, 118.) A trial court does not abuse its discretion by granting summary judgment despite procedural nonconformities where the procedural deficiency does not materially impair the plaintiff's ability to defend against the motion or the court's review of the supporting evidence. (See, e.g., *Holt v. Brock* (2022) 85 Cal.App.5th 611, 620.)

Nor does Mallon's assertion that several of Hologic's "undisputed material facts" contain improper legal conclusions demonstrate error. An alleged failure of the separate

20

statement to set forth the material facts the moving party contends are undisputed (as opposed to legal arguments or conclusions) may *in the court's discretion* constitute a basis to deny the motion. (Code Civ. Proc., § 437c, subd. (b)(1).) Mallon has not shown that the trial court improperly treated any purported "legal conclusions" as undisputed facts or otherwise abused its discretion. Furthermore, because we review the motion for summary judgment de novo, conducting the same procedure as the trial court (*Oakland Raiders*, *supra*, 131 Cal.App.4th at p. 630), any improper characterization in the separate statement of legal conclusions as "undisputed facts" is subject to this court's independent consideration on appeal.

### b. Evidentiary Objections

In her opposition, Mallon asserted objections to the declarations of Carmen Bibel (Hologic's person most knowledgeable), Lapointe, Baydoun, and Heller, and day two of Mallon's deposition testimony. The trial court found that the objections failed to comply with rule 3.1354, requiring specifically formatted separate documents for the objections and proposed order on the objections, and on that basis declined to rule on them.

Mallon contends that this court should sustain the evidentiary objections that she raised in her opposition and the trial court declined to address. (See Code Civ. Proc., § 437c, subd. (q) [providing that objections to evidence not ruled on for purposes of the summary judgment motion are "preserved for appellate review"].) In response, Hologic asserts that the court appropriately declined to rule on the improperly formatted objections and Mallon has effectively forfeited challenging this issue on appeal by instead asking this court to directly address the objections on the merits.

We agree with Hologic that it was within the trial court's discretion not to rule on Mallon's evidentiary objections upon finding they failed to comply with rule 3.1354. (See *Hodjat v. State Farm Mutual Automobile Ins. Co.* (2012) 211 Cal.App.4th 1, 8 [holding trial court did not abuse its discretion in refusing to rule on improperly formatted evidentiary objections]; cf. *Vineyard Springs*, *supra*, 120 Cal.App.4th at p. 642 [holding

21

trial court must rule on evidentiary objections when in proper form].)  Mallon has not challenged that ruling, which we presume correct for purposes of the appeal.  (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.)

While the summary judgment statute expressly preserves for appeal those evidentiary objections that a trial court does not rule upon because the court did not deem them material to its disposition of the motion (Code Civ. Proc., § 437c, subd. (q)), Mallon has not offered legal authority to support her contention that this court should address objections that the trial court implicitly rejected for failure to comply with rule 3.1354's formatting requirements.  Nevertheless, assuming without deciding that the objections were implicitly overruled (by not being expressly ruled upon) and thus preserved for appeal (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 534; *Union Pacific Railroad Co. v. Superior Court* (2024) 105 Cal.App.5th 838, 849), we consider Mallon's objections insofar as they remain material to the issues under consideration.

Mallon objects to statements in the declarations of Bibel, Lapointe, Baydoun, and Heller, all of which pertain to the employees' status within Hologic and whether Lapointe, Baydoun, and Heller exercised decisionmaking authority affecting corporate policy.  Mallon asserts Bibel lacks personal knowledge as to each of the employees and that her statements (and those of the individual employees) offer improper legal conclusions regarding the scope of a corporate employee's discretion and authority.  Citing *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 566–567 (*White*), Mallon argues that whether Lapointe, Baydoun, and Heller served as managing agents with substantial discretionary authority over decisions affecting corporate policy are questions to be determined by the trier of fact and not on a motion for summary judgment.

The cited objections pertain specifically to the issue of whether Hologic may be held liable for punitive damages.  (See *White*, *supra*, 21 Cal.4th at p. 566 [defining the term " 'managing agent' " for purposes of corporate punitive damage liability under Civil Code section 3294, subdivision (b)]; *id* at pp. 566–567 ["to include only those corporate

22

employees who exercise substantial independent authority and judgment in their corporate decisionmaking so that their decisions ultimately determine corporate policy"].) However, as we explain in our analysis *post*, Mallon's punitive damages claim fails with the summary adjudication of her other remaining causes of action. Therefore, any argument on the admissibility of the statements concerning the scope of decisionmaking authority of Lapointe, Baydoun, and Heller is immaterial to the disposition of the motion. We therefore need not resolve Mallon's objections to the Bibel, Lapointe, Baydoun, and Heller declarations and decline to do so.

Mallon also objects to specific excerpts from day two of her deposition testimony. These objections, however, relate to Mallon's testimony in which she referred to Lapointe stating his "opinion" regarding her performance or, in one instance, where she referred to her belief that " 'those opinions were false. They were subjective. They were questioning my competency and my judgment.' " This objection might have been relevant to proof of Mallon's slander and libel causes of action but is not relevant to any remaining issues on appeal. Whether Lapointe's statements regarding Mallon's job performance were "fact" or "opinion" is not material to determining whether there exists a triable issue of material fact as to Mallon's retaliation and wrongful termination in violation of public policy causes of action. We therefore need not resolve and decline to further address Mallon's objections to her day two deposition testimony.

### 3. Whistleblower Retaliation

California's whistleblower protection statute prohibits retaliation against employees for reporting activity they have reason to believe is unlawful. (§ 1102.5, subd. (b); *City of Whittier v. Everest National Ins. Co.* (2023) 97 Cal.App.5th 895, 902 (*City of Whittier*).) Enacted in 1984, section 1102.5 "provide[s] whistleblowers with protection from employer retaliation." (*People ex rel. Garcia-Brower v. Kolla's, Inc.* (2023) 14 Cal.5th 719, 722 (*Garcia-Brower*).) Its provisions " 'reflect[] the broad public policy

23

interest in encouraging workplace whistle-blowers to report unlawful acts without fearing retaliation.' " (*Lawson*, *supra*, 12 Cal.5th at p. 709; *Garcia-Brower*, at p. 723.)

Section 1102.5, subdivision (b) provides that an employer "shall not retaliate against an employee for disclosing information, . . . to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, . . . if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties." Section 1102.6 prescribes the framework for presenting and proving a claim in a civil action pursuant to section 1102.5: "[O]nce it has been demonstrated by a preponderance of the evidence that an activity proscribed by [s]ection 1102.5 was a contributing factor in the alleged prohibited action against the employee, the employer shall have the burden of proof to demonstrate by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by [s]ection 1102.5."

The California Supreme Court in *Lawson*, following a certification order from the Ninth Circuit Court of Appeals, clarified the "proper method for presenting and evaluating a claim of whistleblower retaliation" under the Labor Code. (*Lawson*, *supra*, 12 Cal.5th at p. 707.) The court explained that when applying the statutory framework of section 1102.6, a party need not satisfy the *McDonnell Douglas*[9] burden-shifting test generally adopted by courts for use in employment discrimination and retaliation cases brought under FEHA. (*Lawson*, at pp. 709–710.) Instead, "section 1102.6, and not

---

[9] The United States Supreme Court in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 established a burden-shifting framework for trying claims of intentional employment discrimination cases based on circumstantial evidence.

*McDonnell Douglas*, supplies the applicable framework for litigating and adjudicating section 1102.5 whistleblower claims." (*Id*. at p. 712.)

In contrast to *McDonnell Douglas*, which requires the plaintiff to prove (at the framework's third step) that an employer's proffered legitimate reason for taking an adverse employment action[10] was pretextual, a plaintiff bringing a section 1102.5 claim "does not need to show that the employer's nonretaliatory reason was pretextual. Even if the employer had a genuine, nonretaliatory reason for its adverse action, the plaintiff still carries the burden assigned by statute if it is shown that the employer also had at least one retaliatory reason that was a contributing factor in the action." (*Lawson*, *supra*, 12 Cal.5th at p. 716.)

The court in *Lawson* summarized the respective burdens of proof under section 1102.6: "First, it places the burden on the plaintiff to establish, by a preponderance of the evidence, that retaliation for an employee's protected activities was a contributing factor in a contested employment action. The plaintiff need not satisfy *McDonnell Douglas* in order to discharge this burden. Once the plaintiff has made the required showing, the burden shifts to the employer to demonstrate, by clear and convincing evidence, that it would have taken the action in question for legitimate, independent reasons even had the plaintiff not engaged in protected activity." (*Lawson*, *supra*, 12 Cal.5th at p. 718.)

a. Analytical (Burden-shifting) Framework

Applying the burden-shifting framework established by section 1102.6 in the summary judgment context requires us to consider the parties' burdens of proof at trial. (See *Aguilar*, *supra*, 25 Cal.4th at p. 851.)

---

[10] Although the phrase "adverse employment action" does not appear in the relevant employment discrimination and retaliation statutes, courts recognize the term as "a familiar shorthand expression referring to the kind, nature, or degree of adverse action against an employee that will support a cause of action under a relevant provision of an employment discrimination statute" (*Yanowitz*, *supra*, 36 Cal.4th at p. 1049) or, as utilized here, under section 1102.5.

25

Hologic bears the burden of persuasion on its summary judgment motion. It also bears the initial burden of making a prima facie showing that Mallon's section 1102.5 claim lacks merit because one or more elements of the cause of action cannot be established or there is a complete defense to that cause of action. (Code Civ. Proc., § 437c, sub. (*o*).) More specifically, Hologic's prima facie burden as the moving party defending against the whistleblower retaliation claim is to establish that the evidence does not support a preponderance of the evidence finding that one or more protected whistleblowing acts was a contributing factor in an adverse employment action against Mallon. If, in response, Mallon puts forth evidence that creates a triable issue of material fact as to the contributing factor element, Hologic must then make a further prima facie showing, by clear and convincing evidence, that it would have terminated Mallon for other legitimate and independent reasons notwithstanding her whistleblowing activity. (*Id*., subd. (p)(2); see *Lawson*, *supra*, 12 Cal.5th at p. 718.)

Hologic argues it has met this burden by showing that Mallon cannot meet her initial burden at trial of demonstrating that any of her three instances of alleged, protected activity was a contributing factor in her termination or that the other "alleged slights" referenced in her papers "rise to the level of an adverse employment action." Hologic further contends its motion demonstrated by clear and convincing evidence that it would have eliminated Mallon's position regardless of her protected activity.

Mallon maintains, on the contrary, that viewing the evidence in her favor—as we must in reviewing the summary judgment—and considering the purpose of the whistleblower protection statute and framework for proving a section 1102.5 claim, Hologic cannot show as a matter of law that Mallon's protected acts were not a "contributing factor" in its adverse actions against Mallon.[11] She argues that any analysis

---

[11] In addition to citing the *Lawson* court's articulation of the burden-shifting framework for proving a section 1102.5 claim, Hologic refers to the formulation for a

of the evidence must recognize the legislative purpose behind the statute to protect the whistleblower by raising the employer's evidentiary burden to the heightened " 'clear and convincing' " standard. (See *Lawson*, *supra*, 12 Cal.5th at p. 713.) Furthermore, Mallon points to courts' recognition of the overarching purpose of " ' " 'liberally constru[ing] the Labor Code . . . to favor the protection of employees.' " ' " (*Garcia-Brower*, *supra*, 14 Cal.5th at p. 725.)

In sum, we review the record to determine whether the evidence, construed in the light most favorable to Mallon (*Yanowitz*, *supra*, 36 Cal.4th at p. 1037), fails to support a finding by a preponderance of the evidence that whistleblowing was a contributing factor in Hologic's adverse employment action, and, if not, whether clear and convincing evidence establishes that it "would have taken the action[s] in question for legitimate, independent reasons even had [Mallon] not engaged in protected activity." (*Lawson*, *supra*, 12 Cal.5th at p. 718.) Before answering these questions, we address whether Mallon engaged in whistleblowing activity protected by section 1102.5.

### b. Protected Acts

We agree with the trial court that the undisputed evidence establishes Mallon engaged in activity protected by section 1102.5 when she reported employee qualification nonconformances in March 2015 and April 2016, and training record nonconformance in the R&D department in April 2015. The whistleblower statute prohibits retaliation against an employee "for disclosing information" to a person with authority to investigate

---

section 1102.5 claim whereby a plaintiff establishes a prima facie case of retaliation by showing " '(1) she engaged in a protected activity, (2) her employer subjected her to an adverse employment action, and (3) there is a causal link between the two.' " (*McVeigh v. Recology San Francisco* (2013) 213 Cal.App.4th 443, 468; *Edgerly v. City of Oakland* (2012) 211 Cal.App.4th 1191, 1199 (*Edgerly*); see also *City of Whittier*, *supra*, 97 Cal.App.5th at p. 907.) While this formulation of the plaintiff's initial burden is not inconsistent with the statutory language (requiring plaintiffs to show by "a preponderance of the evidence that an activity proscribed by [s]ection 1102.5 was a contributing factor in the alleged prohibited action against the employee" (§ 1102.6)), the *Lawson* court did not utilize it and focused instead on the statutory formulation. We therefore do the same.

that reflects "a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties."  (§ 1102.5, subd. (b); see also *Edgerly*, *supra*, 211 Cal.App.4th at p. 1199.)  Mallon made the reports in all three instances "to a person with authority over [her]" (§ 1102.5, subd. (b)), or to "another employee who has the authority to investigate, discover, or correct the violation or noncompliance" (*ibid*.) based on information that gave her reasonable cause to believe that the issues she identified were not compliant with federal regulations and could place Hologic at "regulatory risk."  Mallon's reporting to the responsible Hologic employees of issues that she reasonably believed violated federal regulations and placed Hologic at "regulatory risk" therefore falls within the protective provisions of the statute.  (§ 1102.5, subd. (b).)

c.  Prima Facie Claim of Retaliation

We next consider the evidence proffered by Hologic to show that Mallon cannot meet her initial burden of proof at trial to show that one or more of her protected acts in March 2015, April 2015, and April 2016 was a contributing factor in the adverse events culminating in her termination.  This requires us to evaluate to what extent, if at all, the actions alleged by Mallon to comprise a series of adverse employment actions constitute actionable retaliation under section 1102.5.

i.  2015 Protected Acts

As detailed *ante*, the March 2015 reporting incident occurred during Mallon's tenure as senior manager of the diagnostics laboratory, in connection with her internal audit duties.  Mallon communicated to senior director Kielinen that she had identified a potential discrepancy between quality engineer Ricky L.'s qualifications and job description and duties, noted the issue could violate federal regulations, and after some difficulty obtaining the information she sought, verified the engineer's qualifications and deemed the issue "reso[lv]ed."  After Mallon resolved the issue, Kielinen wrote to

28

Mallon's supervisor Werneke expressing his appreciation of her "continued support and assistance with the Sunnyvale internal audit process" and her conscientiousness and "commit[ment] to helping us ensure compliance."

The evidence related to this incident does not support an inference that it was a contributing factor in any subsequent retaliation. It is undisputed that the key individuals involved in the alleged adverse employment actions in 2016 and 2017, namely Lapointe, Baydoun, and Heller, had no part in Hologic's handling of Mallon's March 2015 report concerning Ricky L.'s job qualifications or Mallon's process for verifying such job qualifications. Mallon's briefing on appeal fails to identify any adverse employment action related to or resulting from the March 2015 incident, and in fact, Mallon notes that Hologic awarded her in 2015 "for her outstanding audit work." Because the March 2015 protected act was fully resolved at the time and gave rise to no discernable adverse impact on any aspect of Mallon's employment, we conclude there is no triable issue of material fact related to Mallon's March 2015 protected act as a contributing factor in any subsequent adverse action against Mallon, up to and including her termination in November 2017.

As to the second reporting incident in April 2015, we conclude that the evidence before the trial court at summary judgment establishes that Mallon's protected act was not a contributing factor in her termination or any preceding, alleged adverse actions. Like the March 2015 reporting incident, Mallon's April 2015 protected report arose in connection with Mallon's performance of internal audit duties while still reporting to Werneke. Mallon identified what she believed was a Tier 1 nonconformance in the R&D department's documentation of training records. After Lapointe and other employees in the R&D and quality departments questioned the Tier 1 finding, Kielinen reviewed the issue and recommended changing the reported nonconformance from Tier 1 to Tier 2. Kielinen communicated in a follow-up e-mail to Mallon his reasons for downgrading the observation to a Tier 2 and thanked her for raising the issue. Consistent with Mallon's

29

request to add an addendum to the audit report documenting the change, Kielinen and Ricky L. produced an addendum to the internal audit report explaining the reclassification. Both Ricky L. and Kielinen expressed their appreciation of Mallon's support for the internal audit and quality processes.

Hologic points to this evidence, including that Mallon received accolades and even an award in 2015 for her auditing work, as contrary to any inference of retaliation by Hologic in connection with her internal auditing work. Mallon counters that she "offered extensive direct and circumstantial evidence from which a reasonable jury could infer Hologic's retaliatory motive, especially Lapointe's antagonistic response to learning of her protected activities." She asserts that Lapointe "attacked [her] in an email and phone call with Kielinen," "falsely accused her of violating company policy, posing a risk to Hologic, and performing work outside her job duties," and "influenced the decision to downgrade the nonconformance." A careful examination of the undisputed evidence, however, fails to support this characterization of the facts and instead shows only that Lapointe questioned Mallon's internal audit role and the usefulness of her findings— concerns which Kielinen promptly addressed.

Specifically, after receiving e-mails from Mallon seeking his signature on the internal audit report, Lapointe sent an e-mail to Kielinen in which he expressed concern or possibly confusion about Mallon's role in internal auditing ("why [is] our SDS lab manager [] conducting internal audits!"), asked whether it is "helpful, or poses a risk" and is consistent with Hologic's "own procedures." Lapointe sought Kielinen's input before responding to Mallon. Kielinen responded by explaining to Lapointe Mallon's role in performing internal audits and stated his view that "she is committed to performing a thorough audit with the aim of improving compliance." Even drawing all inferences in favor of Mallon, this e-mail exchange is simply not susceptible to the interpretation that Lapointe "falsely accused [Mallon] of violating company policy, posing a risk to

30

Hologic, and performing work outside her job duties," nor that it constituted "gaslighting" and "false[] critici[sm]" of Mallon. (Boldface omitted.)

Mallon alleges that Lapointe's animus improperly influenced or drove the downgrade of the audit finding. This inference appears to be based not on the evidence in the record pertaining to the April 2015 protected act but on interactions between Lapointe and Mallon beginning in 2016, after Mallon began reporting to Lapointe. Notably, Mallon's initial e-mail to Kielinen indicating that she was "facing resistance for a Tier 1" nonconformance referred not to Lapointe or the R&D team but to two individuals in the quality department ("Bob and Ricky [L.]") who were "disagreeing with the observation and seem[ed] to be asking [her] to change it." While Lapointe separately contacted Kielinen about Mallon's role in the internal audit of the R&D department in April 2015, as noted above, the evidence does not support an inference that Lapointe's purported animus influenced Kielinen to recommend changing the finding. On the contrary, Kielinen testified that he spoke with Lapointe and the quality and product development team members familiar with the details of the nonconformance to discuss whether it was "valid to categorize [the nonconformance] as a Tier I . . . or a Tier II." Kielinen did not "specifically recall" Lapointe's position but "believe[d] [Lapointe] was questioning did [they] have sufficient evidence in support of the . . . the classification." Thus, any influence that Lapointe had on the decision to downgrade the audit finding appears to have been in the context of a broader group discussion, and there is no evidence that Lapointe exercised any unique persuasion over Kielinen, exhibited animus toward Lapointe, or dictated the outcome of the team discussions.

Moreover, even if the evidence supported Mallon's interpretation of Lapointe's response to her April 2015 report of a Tier 1 nonconformance, Mallon has not established that the April 2015 protected act was a "contributing factor" in any adverse employment action. As previously described, Mallon proffered evidence pertaining to 14 instances of alleged adverse employment actions in her opposition to the summary judgment motion

31

(described *ante*, pt. I.B.2.). While we discuss these alleged adverse actions in more detail in relation to the April 2016 protected act, *post*, none of them—with the exception of what Mallon maintains was Hologic's "failure to investigate or take corrective action on Mallon's audit findings" and the "[d]owngrading Mallon's report of a Tier 1 nonconformance"—bear any discernable connection to the April 2015 protected act. (Boldface omitted.)

As for Hologic's decision to downgrade the reported nonconformance and its alleged failure to investigate or take corrective action, neither of these can be reasonably construed as being directed at Mallon, let alone as impacting her employment status or prospects. (See *Yanowitz*, *supra*, 36 Cal.4th at p. 1052 [holding in the FEHA context that "an adverse employment action must materially affect the terms, conditions, or privileges of employment to be actionable"].) The evidence furthermore establishes that Hologic did investigate the audit findings, which were identified in a subsequent FDA audit in September 2015. At Mallon's request, Hologic documented the reclassification in its internal audit findings. Mallon's disagreement with the downgrade decision and disapproval of her employer's investigation or corrective action does not create a triable issue as to any adverse employment action arising from or connected to the April 2015 protected act.

We conclude that the alleged actions stemming from or arguably relating to Mallon's April 2015 protected act do not create a triable issue of fact regarding the protected act as a contributing factor in any actionable adverse employment action.

                              ii.  2016 Protected Act

We turn to the April 2016 report by Mallon of a potential regulatory violation regarding the qualifications of engineer Sonny T. This report occurred approximately six months into Mallon's assignment to the R&D department reporting to Lapointe. As summarized *ante*, Mallon reported to human resources employee Haisenleder that it

appeared quality engineer Sonny T. did not meet the qualifications for his position, which she cautioned could create "weaknesses in the quality area." Human resources employee Hatch later informed Mallon that the senior director for quality had approved Sonny's hire and suggested that she raise any concerns in the future with the quality department. Heller and Haisenleder separately conferred and agreed it was "obnoxious" and that Lapointe was "frustrated" with Mallon for having raised the issue with human resources.

Mallon contends that upon learning about Mallon's report, Lapointe "became enraged" and within one day ordered the May 11 meeting with Mallon and Heller, where he disparaged her, falsely attacked her competence and judgment, and accused her of " 'inappropriate' and 'unprofessional' behavior," including "not staying 'focused' on her job, and 'not having enough [work] to keep [her] busy.' " Mallon asserts that Lapointe thereafter removed Mallon's environmental health and safety and quality audit duties, negatively influenced Heller's and Haisenleder's perception of her, and contrary to Hologic's written policy on performance reviews, refused to complete the " 'Outcomes and Impact' " section of her 2016 performance review, with potential adverse impacts to her pay and promotional prospects. Mallon contends that these instances of increased scrutiny and discipline, together with other actions she identified in opposition to the motion—including Lapointe "demoting" her in January 2017 to report to his direct report Baydoun, and Heller "threatening" her in February 2017 that any further " 'difficulties' " she raised " 'would be considered a pattern' "—reflect a series of adverse actions that culminated in her termination from employment.

Mallon argues that "prior to engaging in protected activity, [she] was not subjected to such accusations of poor performance" and that the totality of the circumstances demonstrates Lapointe's animus was the "connective tissue that bridge[d] Mallon's protect[ed] activity to the ultimate retaliatory act of termination." She further contends that this animus is imputed to Baydoun and Heller (who ultimately decided Mallon's eventual termination) because they acted on information provided by Lapointe, who she

33

maintains had clear discriminatory and retaliatory animus toward her. Mallon also emphasizes Heller's role as human resources manager and maintains that expressions of disdain and disapproval (calling her " 'obnoxious' " and suggesting her complaints would be considered a " 'pattern' ") further demonstrate the retaliatory nature of the adverse employment actions culminating in Mallon's termination.

Mallon challenges the trial court's contrary conclusion that the alleged adverse employment actions "do not form a chain of events from the protected activity to [Mallon]'s termination." She argues that the court erroneously viewed the adverse employment actions "in a vacuum," ignored Mallon's nine-year history of success at the company "before her career took a nosedive" coinciding with "the first protected whistleblower activity that exposed potential non-compliance of her superior, Lapointe," and failed to consider the totality of the circumstances or collective impact of the treatment Mallon experienced after her protected actions. Citing *Yanowitz* and the California Supreme Court's recent decision in *Bailey*, *supra*, 16 Cal.5th 611,[12] discussing what constitutes adverse employment action in an analogous context under FEHA, Mallon argues that it is not necessary to decide whether each alleged act by Hologic constitutes retaliation, since it is the series of acts, taken together, that comprise a pattern of retaliation.

Hologic counters, citing *Le Mere v. Los Angeles Unified School Dist.* (2019) 35 Cal.App.5th 237, 243–244 (*Le Mere*) that insofar as Mallon's termination occurred more than 18 months after she last engaged in any protected activity, it is unequivocally "too long to support an inference of causation." In *Le Mere*, the appellate court observed in a

_____

[12] Pursuant to rule 8.254(a), appellant filed a letter, prior to oral argument in this matter, informing the court that *Bailey* constituted new authority that was not available at the time the parties completed their briefing. We remind appellant's counsel that the applicable rule allows only a citation to the new authority and identification of the issue on appeal to which the authority is relevant. (*Id*., rule 8.254(b).) To the extent that appellant's letter contains additional argument and discussion related to the new authority's applicability here, we disregard it.

FEHA retaliation case that "close temporal proximity between a plaintiff's protected activity and the alleged retaliatory conduct against the plaintiff has been found sufficient to support a prima facie case of causation" (*id*. at p. 243), while "intervals of more than a few months" have been held by several federal courts to be "too long to support causation" (*ibid*). (Cf. *Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 478 (*Flait*) [evidence the plaintiff was terminated "only a few months" after disclosing the supervisor's harassment of a female employee was sufficient to withstand summary judgment on the issue of retaliatory motives].) Hologic submits that Mallon's attempt to bridge the lack of temporal proximity between April 2016 and November 2017 by relying on the "collective impact" of its actions is without merit because—even considered collectively—the interim actions constitute " '[m]inor or relatively trivial adverse actions . . . that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee [and] do not materially affect the terms or conditions of employment.' " (*Francis v. City of Los Angeles* (2022) 81 Cal.App.5th 532, 541 (*Francis*).)

Drawing on case law defining actionable retaliatory conduct for purposes of a FEHA retaliation claim,[13] we agree with Mallon that the appropriate inquiry requires more than a piecemeal approach and that we must consider the totality of the alleged acts in context. "Retaliation claims are inherently fact specific, and the impact of an employer's action in a particular case must be evaluated in context. Accordingly, although an adverse employment action must materially affect the terms, conditions, or privileges of employment to be actionable, the determination of whether a particular action or course of conduct rises to the level of actionable conduct should take into

---

[13] FEHA prohibits, as an unlawful employment practice, any employer from acting to "discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this [statute] or because the person has filed a complaint, testified, or assisted in any proceeding under this [statute]." (Gov. Code, § 12940, subd. (h).)

account the unique circumstances of the affected employee as well as the workplace context of the claim." (*Yanowitz*, *supra*, 36 Cal.4th at p. 1052.) In other words, "there is no requirement that an employer's retaliatory acts constitute one swift blow, rather than a series of subtle, yet damaging, injuries." (*Id*. at p. 1055; see *Bailey*, *supra*, 16 Cal.5th at p. 638 ["Retaliatory acts may take the form of 'a series of subtle, yet damaging, injuries,' and '[e]nforcing a requirement that each act separately constitute an adverse employment action would subvert the purpose and intent of the statute.' "].) It is therefore "appropriate" to consider the plaintiff's allegations "collectively." (*Yanowitz*, at p. 1056.)

At the same time, it is well settled that "[m]inor or relatively trivial adverse actions or conduct by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment and are not actionable." (*Yanowitz*, *supra*, 36 Cal.4th at p. 1055.) The rule derived from these principles is that "an adverse employment action is not limited to 'ultimate' employment acts, such as a specific hiring, firing, demotion, or failure to promote" (*Akers v. County of San Diego* (2002) 95 Cal.App.4th 1441, 1455 (*Akers*)), but to be actionable "must result in a substantial adverse change in the terms and conditions of the plaintiff's employment. A change that is merely contrary to the employee's interests or not to the employee's liking is insufficient." (*Ibid*.; see *Thomas v. Department of Corrections* (2000) 77 Cal.App.4th 507, 511; accord *Pinero v. Specialty Restaurants Corp.* (2005) 130 Cal.App.4th 635, 641 [noting California courts "have been united in the view that an employer's intermediate decision or action 'constitutes actionable retaliation only if it had a substantial and material adverse effect on the terms and conditions of the plaintiff's employment' "].)

In the FEHA context, "adverse treatment that is reasonably likely to impair an employee's job performance or prospects for advancement in their career falls within the reach of FEHA's antiretaliation provision." (*Bailey*, *supra*, 16 Cal.5th at pp. 637–638.)

Nevertheless, evidence that an employment decision has a substantial and detrimental effect on the terms and conditions of employment is insufficient to satisfy the plaintiff's initial showing of retaliation, absent evidence that the adverse decision is linked to the employee's protected activity. (See *McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 388 (*McRae*).)

Courts apply this standard to retaliation claims under section 1102.5. In *Francis*, a police department criminologist sued her municipal employer (the City) for whistleblower retaliation under section 1102.5 after she experienced negative repercussions following her disclosure of information about a detective's comments in a cold case murder investigation. (*Francis*, *supra*, 81 Cal.App.5th at pp. 534–535.) The plaintiff alleged that after making her protected disclosure, she suffered a series of adverse employment actions, including (1) a supervisor improperly ordered her to attend therapy based on a false pretext; (2) she was taken off of high profile cases; (3) she was accused of dishonesty and criticized for answering questions "with more questions"; (4) her supervisor interfered with her work by ordering her away from assigned tasks and set her up for failure; and (5) she testified less frequently in court cases. (*Id.* at p. 543.)

On appeal from a defense verdict after trial, the appellate court in *Francis* concluded that nonsuit should have been granted for the City because the evidence was insufficient to prove that the plaintiff suffered an adverse employment action. (*Francis*, *supra*, 81 Cal.App.5th at pp. 540, 541.) Citing retaliation cases under FEHA, the *Francis* court stated that "[t]o prove a claim of retaliation under [section 1102.5], the plaintiff 'must demonstrate that he or she has been subjected to an adverse employment action that materially affects the terms, conditions, or privileges of employment.' " (*Id.* at pp. 540–541.) The court noted it was undisputed that the City never demoted, suspended, or terminated the plaintiff's employment, there was no evidence she had received any negative performance reviews, and that at the time of trial, her salary was greater than it was prior to her work on the cold case. (*Id.* at p. 543.) Furthermore, the court evaluated

each of the alleged adverse actions and concluded that whether "viewed in isolation or collectively" (*ibid*.), they did " 'not materially affect the terms or conditions of employment.' " (*Id*. at p. 545.)

Hologic asserts that, like in *Francis*, the alleged adverse actions Mallon experienced are insufficient as a matter of law to establish retaliation. Hologic points out that Lapointe's elimination of Mallon's environmental health and safety and quality audit responsibilities and failure to complete all parts of Mallon's performance review do not support an inference of an adverse employment action because Mallon's changed job duties reflected the expectations of her new position following her transfer to R&D, and despite leaving certain parts of the performance review blank, Mallon herself recognizes that Lapointe gave her a " 'very good' " performance rating. Hologic contends that "none of the alleged slights" identified by Mallon, separately or together, constitute an actionable adverse employment action having a "material effect on the terms and conditions" of employment (*Akers*, *supra*, 95 Cal.App.4th at p. 1460; see *Yanowitz*, *supra*, 36 Cal.4th at p. 1052), especially given the significant passage of time between Mallon's protected act, Lapointe's allegedly negative reaction, and her termination. (See *Le Mere*, *supra*, 35 Cal.App.5th at pp. 243–244.)

Bearing in mind the principles established in *Yanowitz* and resolving any doubts concerning the evidence of Hologic's alleged adverse actions against Mallon in her favor, we conclude the facts here—like in *Francis*—fall short of supporting an inference of actionable retaliation. There is no dispute that the elimination of Mallon's position constituted a "substantial adverse change in the terms and conditions of [her] employment" (*Akers*, *supra*, 95 Cal.App.4th at p. 1455) potentially coming within the purview of the statutory prohibition on retaliation as an adverse employment action. We furthermore agree with Mallon that such a significant temporal gap between the whistleblowing event or events and the adverse employment action does not preclude, as

38

a matter of law, a prima facie showing that the protected act was a contributing factor in the later termination.

Nevertheless, the passage of a year and a half between Mallon's last protected activity (reporting the Sonny T. alleged nonconformance) and the "substantial adverse change" (*Akers*, *supra*, 95 Cal.App.4th at p. 1455) in her employment status renders untenable any inference of causation under the circumstances here. (See *Le Mere*, *supra*, 35 Cal.App.5th at pp. 243–244; cf. *Flait*, *supra*, 3 Cal.App.4th at p. 478.) Because the evidence that Hologic terminated Mallon's position 18 months after she reported the possible nonconformance to human resources does not support—without more—an inference of retaliation, we must consider the numerous interim events and actions taken by Lapointe and Hologic as possible evidence of retaliatory animus linking the protected activity to the eventual elimination of her position. We view these interim acts in context of " 'the unique circumstances of the affected employee as well as the workplace' " and consider them " 'collectively,' rather than individually." (*Bailey*, *supra*, 16 Cal.5th at p. 638.)

As evidence of his anger and animus, Mallon points to the fact that Lapointe expressed displeasure with her following her transition to his department, reported to Heller that Mallon " 'doesn't integrate well' " (which Hologic acknowledges was a "negative" comment), removed essential duties from her scope of work and directed her to stop doing anything other than product development, omitted key beneficial parts of her performance review, and reassigned her to report directly to Baydoun for closer supervision. Mallon asserts that Lapointe's reassignment of her in January 2017 to report directly to Baydoun constituted a demotion and argues that these events formed a chain of adverse actions stemming from Lapointe's disapproval of her protected acts.

We conclude that these facts do not support a prima facie showing that the interim acts established a chain originating from or related to Mallon's protected act of reporting a purportedly unqualified engineer or any of her prior protected acts. Lapointe's

39

criticisms to the effect that Mallon "was resisting taking on new R&D assignments since joining the department" and failed to " 'integrate well' " may be described as the sort of "mere oral or written criticism[s] of an employee" (*Akers*, *supra*, 95 Cal.App.4th at p. 1457) that do not give rise to an actionable complaint if unaccompanied by other evidence of retaliatory action. The same is true for Heller's observations, based apparently on input from Lapointe, that Mallon " 'doesn't integrate well' " and that Lapointe's "issue" with her was that she "but[t]s her nose" into other business.

These statements are moreover tempered by the undisputed evidence that despite omitting the "Outcomes and Impact" part of her performance review, Lapointe's 2016 review was positive and gave Mallon a " 'very good' " performance rating. Nor is there evidence to suggest that Lapointe's decisions to remove Mallon's duties related to quality audits and to later reassign her to his direct report, Baydoun, bore any connection to the protected act of reporting her concerns about Sonny T.'s qualifications or itself constituted an adverse change in her employment. "A transfer is not an adverse employment action when it is into a comparable position that does not result in substantial and tangible harm." (*McRae*, *supra*, 142 Cal.App.4th at p. 393.) The evidence does not support Mallon's characterization of these actions as occurring under "false pretenses" (boldface omitted) related to Lapointe's effort to reduce Mallon's impact at Hologic, as all evidence suggests that Lapointe moved Mallon to Baydoun's supervision to provide better support and address the perceived challenges Mallon faced in her transition to the R&D team. In addition, Mallon's salary and title remained unchanged.

These facts stand in contrast to cases like *Akers* and *Bailey*, both of which involved an employer's undeniably adverse response to an employee's protected complaint alleging discriminatory conduct.

For example, in *Akers*, a deputy district attorney complained to her employer that she had been forced out of her preferred unit, among other reasons, because of her

pregnancy. (*Akers, supra*, 95 Cal.App.4th at pp. 1446–1447.) The employer initiated an investigation that resulted in a negative performance review and counseling memorandum accusing the deputy district attorney of " 'incompetence,' 'dishonesty' and 'insubordination' " and refusing to transfer her to the assignment she sought. (*Id.* at p. 1456.) In deciding that a jury could reasonably conclude the actions of the employer were retaliatory, the Court of Appeal observed it was undisputed at trial "that 'an accusation of dishonesty' against a prosecutor 'can be a career ender' " and that the next level of promotion for the deputy district attorney would have been "highly competitive and largely controlled by the 'subjective evaluations' " (*ibid.*) of those superiors whose conduct could be reasonably interpreted as "intended to substantially and materially obstruct [the plaintiff]'s prosecutorial career." (*Ibid.*) The Court of Appeal concluded that "[a]lthough [the plaintiff] did not prove a denial of a specific promotional opportunity, there was evidence showing [she] left the district attorney's office because of the adverse actions taken against her and the severe damage to her reputation within the office." (*Ibid.*)

Thus, in *Akers*, the undisputed evidence supported a finding that the deputy district attorney's complaint about the employer's response to her pregnancy gave rise to the adverse performance review and substantially interfered with her employment prospects. (*Akers, supra*, 95 Cal.App.4th at p. 1456.) Similarly, in *Bailey*, the California Supreme Court reversed the appellate court's decision affirming the trial court's grant of summary judgment in favor of the government employer. Our high court determined that the course of conduct by the department's personnel officer—viewed in light of the totality of the circumstances of the affected employee and workplace context—could support a finding of retaliation under FEHA. (*Bailey, supra*, 16 Cal.5th at pp. 638–639.)

The course of conduct at issue in *Bailey* included (but was not limited to) the personnel officer's "obstruction of the investigation" into the plaintiff employee's racial harassment claim by twice failing to submit a formal complaint, her "chastising of" the

41

plaintiff for recounting the harassing incident (which involved a coworker's alleged use of a racial slur) to coworkers and warning that the plaintiff's complaint might create a hostile work environment for the coworker who had used the racial slur, and her "hostility" toward the plaintiff, which included "ignoring [the plaintiff], laughing at her, staring at her, jeering at her, and once mouthing the words 'you are going to get it' to her." (*Bailey*, *supra*, 16 Cal.5th at p. 638.)  The court observed that a reasonable trier of fact could view such conduct "by the human resources manager responsible for receiving complaints of harassment and discrimination in the workplace" as more than "a '[m]inor or relatively trivial' action that does no more than anger or upset the affected employee." (*Id*. at p. 639.)  Citing the purposeful obstruction of the harassment complaint and escalating threats by the personnel officer, our high court concluded that while it is "ultimately . . . for a jury to decide whether [the personnel officer]'s conduct rises to the level of an adverse employment action in this case, such conduct could be understood as quintessentially retaliatory." (*Id*. at p. 640.)

Here, a fact finder could not reasonably conclude that the actions preceding Mallon's termination were related to her protected activity, or in the California Supreme Court's words, were "quintessentially retaliatory" (*Bailey*, *supra*, 16 Cal.5th at p. 640), because most of the allegedly offending conduct against Mallon was in reference to her unsuccessful transition to the R&D department.  The record does not support a finding that those adverse comments that did pertain to Mallon's April 2016 Sonny T. report (i.e., the conversation between Heller and Haisenleder calling Mallon's actions "obnoxious") bore any connection to Baydoun's eventual determination that Mallon's position was "not quite working out" and Heller's assessment that the position was "not clearly needed."  While the narrowing of Mallon's duties exclusively to her R&D scope of work and move to report to Baydoun instead of Lapointe represented changes "contrary to the employee's interests [and] not to the employee's liking" (*Akers*, *supra*, 95 Cal.App.4th at

42

p. 1455), none of those changes adversely affected the terms and conditions of Mallon's employment. (*Ibid.*)

Furthermore, many acts identified by Mallon as part of the "chain of events" were not executed or directed by Lapointe, as the prime actor allegedly exercising a retaliatory motive, nor was Lapointe individually or primarily responsible for Mallon's termination.[14] Like in *Francis*, where the City's alleged adverse actions against the plaintiff criminologist either did not stem from the City's action (but reflected actions by individuals in the county district attorney's office), or constituted complaints about the plaintiff's work performance and perceived interference in her work that did " 'not materially affect the terms or conditions of employment' " (*Francis, supra*, 81 Cal.App.5th at p. 545), the actions identified by Mallon that occurred during the 18-month window between her last protected act and her termination cannot reasonably be construed as having materially affected the terms, conditions, or privileges of Mallon's employment. (*Yanowitz, supra*, 36 Cal.4th at p. 1052; *Francis*, at pp. 540–541.)

Mallon's subsequent termination, though undeniably adverse to her employment interest, does not change the nature of the actions that preceded it or render retaliatory her termination. The evidence, viewed collectively (*Yanowitz, supra*, 36 Cal.4th at p. 1056), fails to support an inference by a preponderance of the evidence that any of Mallon's protected acts, including her April 2016 protected disclosure, was a contributing factor in the alleged chain of conduct spearheaded by Lapointe (including his criticisms of Mallon's performance in R&D, his failure to fill out all parts of her otherwise positive

---

[14] We agree with the trial court's assessment that several of the alleged adverse employment actions identified by Mallon were not directed at her (such as Hologic's alleged failure to fully investigate or take corrective action on Mallon's reports of nonconformance, or the decision to downgrade the Tier 1 nonconformance to Tier 2) or for which there is insufficient support in the record to support Mallon's allegations (such as regarding her exclusion from meetings and the withholding of information that Mallon needed to do her job).

performance review, his decision to transfer her to work under Baydoun, and his concurrence in Baydoun's and Heller's termination decision).

Exercising de novo review of the evidence, we conclude that Hologic has met its prima facie burden on summary judgment of demonstrating that Mallon cannot show her protected act or acts were a contributing factor in the chain of events that resulted in her termination. (Code Civ. Proc., § 437c, subd. (p)(2); § 1102.6; *Lawson*, *supra*, 12 Cal.5th at p. 718.) Having so concluded, we need not consider the parties' additional arguments concerning Hologic's burden to demonstrate by clear and convincing evidence that it had legitimate, independent reasons for terminating Mallon and would have eliminated Mallon's position regardless of her protected activity in April 2016. (Code Civ. Proc., § 437c, subd. (p)(2); *Lawson*, at p. 718.) The trial court thus did not err in granting Hologic's motion as to the whistleblower retaliation cause of action.

### 4. Wrongful Termination

In her complaint, Mallon alleged that Hologic fired her because of a violation of fundamental public policies against discrimination, harassment, and retaliation.

"The central assertion of a claim of wrongful termination in violation of public policy is that the employer's motives for terminating the employee are so contrary to fundamental norms that the termination inflicted an injury sounding in tort." (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 702.) Mallon's claim for wrongful termination in violation of public policy in this case is premised on her section 1102.5 retaliation claim as the underlying source of statutory authority. (See *Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 889–890 [stating that the public policy at issue must be established by constitutional or statutory provision].) The trial court found the wrongful termination claim failed with the summary adjudication of the predicate retaliation claim.

On appeal, Mallon asserts that if this court should reverse the trial court's decision as to the whistleblower retaliation cause of action, her wrongful termination claim must be allowed to proceed to trial. As we have concluded the trial court did not err in its

44

decision on Mallon's whistleblower retaliation cause of action, we likewise conclude the court did not err in granting summary adjudication of Mallon's eighth cause of action for wrongful termination.

### 5. Punitive Damages

Among the relief sought in the complaint, Mallon requested "exemplary and punitive damages" against Hologic. The trial court addressed the issue of punitive damages in its order, despite finding the claim "falls away" with the grant of summary judgment as to all remaining causes of action. It concluded that Mallon's punitive damages claim failed for the additional reason that Mallon could not establish Hologic's liability as a corporate employer under the governing statute. (See Civ. Code, § 3294, subd. (b) [precluding corporate employer liability for punitive damages based on acts of employees except as specified, including where the act of oppression, fraud, or malice was committed, authorized, or ratified by a corporate officer, director, or managing agent of the company].)

Mallon contends that triable issues of material fact preclude summary judgment on her claim for punitive damages, including whether Lapointe acted with malice and whether the decisionmakers responsible for her employment termination (Lapointe, Baydoun, and Heller) were managing agents of Hologic for purposes of assigning corporate employer liability for punitive damages. However, Mallon's claim for punitive damages necessarily assumes she can prevail on any of the underlying causes of action. (See Civ. Code, § 3294, subd. (a) [authorizing punitive damages in noncontractual civil actions based on proof by clear and convincing evidence "that the defendant has been guilty of oppression, fraud, or malice"].) Given our affirmance of the trial court's summary adjudication rulings, no causes of action remain. We decline to reach the arguments raised by Mallon as to her claim for punitive damages.

45

*B. Costs Award*

Mallon separately challenges the trial court's postjudgment order on costs. Mallon contends that while the trial court correctly denied costs incurred before the dismissal of her FEHA claims, it erred by failing to strike "the entirety of Hologic's costs." She asserts that her non-FEHA claims are "intertwined [with] and inseparable" from her FEHA claims. She argues that because the claims are intertwined, Hologic's costs request is governed not by the general rule that awards costs to a prevailing party (Code Civ. Proc., § 1032, subd. (b)) but by FEHA's cost provision. Under FEHA, a prevailing defendant in a civil action may not be awarded costs absent a finding by the court that the action was frivolous when brought, or the plaintiff continued to litigate "after it clearly became so." (Gov. Code, § 12965(c)(6).) Hologic disputes the continuing applicability of FEHA after Mallon's voluntary dismissal of those claims and contends it is entitled to all costs incurred after that point as the prevailing party under Code of Civil Procedure section 1032.

1. Additional Background

Mallon's costs motion sought an order striking costs in its entirety or, alternatively, limiting Hologic only to reasonable costs for the litigation period following the stipulated dismissal of FEHA claims.

In support, Mallon cited her declaration and those of her counsel and requested judicial notice of Hologic's excerpted Form 10-Q and 10-K filings. Mallon asserted that the claims remaining after her voluntary dismissal of the FEHA claims were "intertwined and inseparable" from the FEHA claims in that the remaining claims were "based on the same set of facts and misconduct" arising from the dismissed age and gender discrimination claims. She argued that Lapointe engaged in "subtle and direct" forms of gender discrimination against her "including micro-managing, isolating, undermining, demeaning, humiliating, threatening and verbally harassing" her, which formed "part of a larger campaign to discriminate and retaliate against [her] for having the audacity – as a

46

talented and respected female scientist – to challenge [] Lapointe and report legal violations in his department." Mallon asserted that the discriminatory acts by Hologic and Lapointe were inextricably linked to the section 1102.5 retaliation, defamation, and wrongful termination claims and that it would be "impractical and impossible to apportion costs" between them.

Citing federal cases, Mallon contended that other factors confirmed Hologic should be denied its costs. These factors included Mallon's limited financial resources, the economic disparity between her and Hologic, the chilling effect of imposing costs on individual employees bringing civil rights claims against corporate employers, the public importance of the issues at stake given Mallon's allegations of workplace discrimination and retaliation for engaging in protected acts for the benefit of medical device product safety, the "close and difficult" nature of the issues in the case, and Mallon's good faith efforts throughout the litigation. Mallon argued that the dismissal of her FEHA claims did not "transform her case" into a non-FEHA case and pointed to the language of the parties' joint stipulation expressly authorizing the court to " 'consider[] an offset to any recoverable attorneys' fees or costs to the extent any fees sought by Hologic were, in part, in pursuit of" the dismissed claims. (Underscoring & boldface omitted.)

In the alternative, Mallon argued that even assuming Hologic was entitled to costs, its requested costs were "overbroad, inflated, and unnecessary" and had to be limited in accordance with the statutory authorization for recoverable costs. (See Code Civ. Proc., § 1033.5, subd. (a).)

Hologic filed opposition to the costs motion, supported by the declaration of counsel and additional evidence. It argued that, as the prevailing party, it was entitled to recover " 'reasonable and necessary' " costs as a matter of right, including those incurred in defending against the purportedly " 'intertwined and inseparable' " FEHA and non-FEHA claims. It pointed out that Mallon "continued to aggressively litigate her non-FEHA claims *after* she voluntarily dismissed her FEHA claims; thus, by definition, the

47

non-FEHA and FEHA claims were not 'intertwined and inseparable.' " (Underscoring & boldface omitted.) Hologic further argued that the non-FEHA claims for whistleblower retaliation, libel, slander, and wrongful termination were based on "separate and distinct factual allegations and legal theories" from her FEHA claims, which were premised on alleged discrimination and/or harassment based on her age and gender.

Hologic contended that Mallon's discrimination and harassment claims "were frivolous from the outset and never developed factually or legally," leading Mallon to voluntarily dismiss them with prejudice after Hologic filed its first motion for summary judgment. Hologic maintained the " 'other factors' " cited by Mallon in support of her costs motion were "meritless" because costs are awarded as a matter of right pursuant to Code of Civil Procedure section 1032, subdivision (b). Furthermore, Mallon did not include any evidence to support her claim of financial hardship. Hologic disputed Mallon's contention that it had failed to support the nature and amount of costs requested but nevertheless submitted additional evidence to substantiate its request.

Mallon's reply to Hologic's opposition, supported by supplemental declarations of counsel and Mallon, asserted that Hologic failed to establish the non-FEHA claims were distinct and separable from the FEHA claims, or that the FEHA claims were frivolous, and had not shown that it incurred any additional costs due to the non-FEHA claims.

After briefing and oral argument, the trial court took the matter under submission and issued a written order granting in part Mallon's costs motion. With respect to costs incurred before September 15, 2022, the court found that Mallon's FEHA claims were not frivolous when brought and that litigation of the non-FEHA claims during that period did not increase Hologic's costs. The court therefore granted Mallon's motion to strike costs incurred before September 15, 2022.

The trial court denied Mallon's motion to strike with respect to costs incurred after the dismissal of Mallon's FEHA claims on September 15, 2022, finding that Government Code section 12965(c)(6) did not apply once no FEHA claims remained in the case. The

48

court further found Hologic's claim for $25,615.29 in post-September 15, 2022 costs was not overstated and was supported by the exhibits to the memorandum of costs. The court concluded the requested costs were " 'reasonable in amount' " and " 'reasonably necessary to the conduct of the litigation.' " It rejected Mallon's argument that it could reduce the costs award due to financial hardship, noting it lacked "discretion to reduce the amount of Hologic's reasonably incurred costs based on Mallon's ability to pay." The court ordered Mallon to pay Hologic $25,615.29 in costs.

2. Legal Principles and Standard of Review

The right to recover costs of suit is statutory. (*Rozanova v. Uribe* (2021) 68 Cal.App.5th 392, 399 (*Rozanova*).) The parties dispute which statute governs Hologic's request for costs with respect to those costs incurred after September 15, 2022, when Mallon dismissed her FEHA causes of action.

Code of Civil Procedure section 1032 generally guarantees the prevailing party in civil litigation the award of the costs of suit: "Except as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding." (Code Civ. Proc., § 1032, subd. (b) (Code of Civil Procedure section 1032(b)); see *Williams v. Chino Valley Independent Fire Dist.* (2015) 61 Cal.4th 97, 100 (*Williams*).) Code of Civil Procedure section 1033.5 specifies those costs that are allowable under section 1032 (*id.*, § 1033.5, subd. (a)), not allowable except when expressly authorized by law (*id.*, subd. (b)), and that may be allowed or denied in the court's discretion (*id.*, subd. (c)(4)). "All costs awarded must be 'reasonable in amount' and 'reasonably necessary to the conduct of the litigation rather than merely convenient or beneficial to its preparation.' (Code Civ. Proc., § 1033.5, subd. (c)(2), (3).)" (*Berkeley Cement, Inc. v. Regents of University of California* (2019) 30 Cal.App.5th 1133, 1139 (*Berkeley Cement*).)

Government Code section 12965(c)(6) provides for a discretionary award of costs of suit in civil actions brought under FEHA, "except that . . . a prevailing defendant shall

49

not be awarded fees and costs unless the court finds the action was frivolous, unreasonable, or groundless when brought, or the plaintiff continued to litigate after it clearly became so." The California Supreme Court in *Williams* held that FEHA's cost recovery provision "is an express exception to Code of Civil Procedure section 1032(b) and the former, rather than the latter, therefore governs costs awards in FEHA cases." (*Williams*, *supra*, 61 Cal.4th at p. 105.)

Generally, the standard of review for a costs award is abuse of discretion. (*Rozanova*, *supra*, 68 Cal.App.5th at p. 399.) However, to the extent the issue to be determined depends on our interpretation of the cost statutes, it presents a question of law which we review de novo. (See *Berkeley Cement*, *supra*, 30 Cal.App.5th at p. 1139; *Foothill-De Anza Community College Dist. v. Emerich* (2007) 158 Cal.App.4th 11, 27.) "Our objective in construing the statute 'is to ascertain and effectuate legislative intent, giving the words of the statute their usual and ordinary meaning.' " (*Rozanova*, at p. 402.)

### 3. Analysis

*Williams* confirmed that FEHA's cost recovery provision (at that time Government Code section 12965, former subdivision (b), now subdivision (c)(6)[15]) operates as an exception to the general rule entitling prevailing civil litigants to their costs of suit. (*Williams*, *supra*, 61 Cal.4th at p. 105.) "By making a cost award discretionary rather than mandatory, Government Code section 12965[(c)(6)] expressly excepts FEHA actions from Code of Civil Procedure section 1032(b)'s mandate for a cost award to the prevailing party." (*Ibid*.)

Whether Hologic is entitled to costs incurred after Mallon's dismissal of her FEHA claims thus depends on whether FEHA's exception applies to the non-FEHA claims (whistleblower retaliation (§ 1102.5), slander, libel, and wrongful termination)

---

[15] Statutes 2021, chapter 278, section 7.

litigated during that latter period.  Stated differently, we must decide whether Mallon's ongoing civil action to pursue her whistleblower retaliation and defamation claims remained a "FEHA action" for purposes of the cost recovery statute.

We conclude it did not.  In reaching this decision, we look to several cases since *Williams* that have examined the application of specific fee-shifting statutes in actions involving multiple causes of action, not all of which come under the fee-shifting provision.

The Court of Appeal in *Roman v. BRE Properties, Inc.* (2015) 237 Cal.App.4th 1040 (*Roman*) affirmed a grant of summary judgment in favor of the defendant on the plaintiffs' disability discrimination claims.  (*Id*. at p. 1053.)  The claims included causes of action under FEHA, the Unruh Civil Rights Act, the Disabled Persons Act (DPA), the Unfair Competition Law, and for negligence.  (*Id*. at p. 1045.)  In reviewing the cost award, the appellate court rejected the proposition that the defendant was entitled to costs "regardless of the FEHA standard" because the plaintiffs had "unsuccessfully pursued causes of action . . . under several statutes other than FEHA (the Unruh Civil Rights Act, the DPA and the UCL) and for negligence."  (*Id*. at p. 1059.)

The *Roman* court explained that while the defendant would be entitled under Code of Civil Procedure section 1032(b) to recover allowable costs incurred in defending non-FEHA causes of action, there remained a question whether FEHA's discretionary cost provision applies "to costs that cannot be apportioned between overlapping FEHA and non-FEHA claims."  (*Roman*, *supra*, 237 Cal.App.4th at p. 1059.)  Looking to the California Supreme Court's treatment of similar questions involving fee awards, the court reasoned that where FEHA and non-FEHA claims are "intertwined and inseparable" (*ibid*.), compelling payment of costs "would weaken private enforcement of vital antidiscrimination and disability rights statutes, 'tend[ing] to discourage even potentially meritorious suits by plaintiffs with limited financial resources.' "  (*Id*. at pp. 1059–1060.)  The court held that where such "overlapping costs . . . have not added to the burden of the

51

litigation on the party defending against FEHA claims" (*id*. at p. 1060), FEHA's cost provision under Government Code section 12965 controls. (*Id*. at p. 1062.)

In *Dane-Elec Corp., USA v. Bodokh* (2019) 35 Cal.App.5th 761, the Court of Appeal applied similar reasoning to circumstances involving a conflict between statutory and contractual attorney fee provisions in an action for nonpayment of wages, where the statutory provision (§ 218.5) "prohibits a prevailing party employer from recovering attorney fees unless the trial court finds the employee brought the wage claim in bad faith." (*Dane-Elec*, at p. 764.) The court examined "whether an employer may recover attorney fees incurred in successfully defending a wage claim, found not to have been brought in bad faith, when the wage claim was inextricably intertwined with a contract claim for which the employer would otherwise be contractually entitled to recover attorney fees." (*Ibid*.) It held that, unless the trial court finds the wage claim was brought in bad faith, the statutory fee-shifting provision prohibits a non-employee prevailing party from recovering attorney fees for successfully defending a wage claim "[t]o the extent the wage claim and the contract claim are inextricably intertwined." (*Ibid*.; see also *id*. at p. 774.) The court in *Dane-Elec* cited *Roman* as support for this application of the law, noting that "when necessary to vindicate an express public policy, a specific fee-shifting statute will control over a general statutory provision awarding attorney fees or costs to a prevailing party. When attorney fees or costs have been incurred on claims subject to both statutes, the more specific fee-shifting statute will govern the entire award of fees or costs." (*Id*. at p. 775.)

Applying these principles to a different set of facts in which the plaintiff prevailed on certain non-FEHA claims but lost on all her FEHA claims, the Court of Appeal in *Moreno v. Bassi* (2021) 65 Cal.App.5th 244 (*Moreno*) explained that Government Code section 12965(c)(6) narrows the plaintiff's cost recovery to which she otherwise would be entitled under Code of Civil Procedure section 1032(b) with respect to those costs "caused *solely* by the inclusion of the FEHA causes of action in [the] lawsuit." (*Moreno*,

52

at p. 261.) With respect to costs related to both the plaintiff's FEHA and non-FEHA causes of action, the court applied the reasoning in *Roman* to conclude that the general cost recovery provision (Code Civ. Proc., § 1032(b)) authorizes the recovery of " 'costs incurred as the result of defending intertwined and inseparable FEHA and non-FEHA claims.' " (*Moreno*, at p. 262.) Costs incurred solely based on the plaintiff's pursuit of the FEHA causes of action could not be recovered. (*Ibid.*)

Mallon cites *Roman* and *Dane-Elec* in support of her claim that the FEHA exception applies not only to the FEHA causes of action, but also to "any other cause of action that is intertwined and inseparable with the FEHA claims." (*Roman*, *supra*, 237 Cal.App.4th at p. 1062, fn. 20.) She contends her case represents "an expanded FEHA case." She reasserts the same arguments she did in the trial court to support her claim that the retaliation, wrongful termination, and defamation claims are inextricably linked to the dismissed FEHA claims.

While we agree with Mallon's interpretation of the case law, we are not persuaded that the trial court erred in applying that authority to the circumstances of this case. To avoid discouraging meritorious antidiscrimination claims, we apply FEHA's narrower, fee-shifting statute whenever non-frivolous FEHA and non-FEHA claims are intertwined and cannot be practicably apportioned. (*Roman*, *supra*, 237 Cal.App.4th at p. 1062; *Moreno*, *supra*, 65 Cal.App.5th at p. 262.) As stated in *Roman*, this occurs when the costs of defending non-FEHA claims "have not added to the burden of the litigation on the party defending against FEHA claims." (*Roman*, at p. 1060.)

To the extent that Mallon has shown the non-FEHA claims arose from the same set of facts and overlapping allegations as the FEHA claims, we agree with the trial court's assessment that the overlap did not extend beyond the dismissal of the FEHA

claims.[16] Even assuming Hologic did not incur additional costs during the period preceding dismissal of the FEHA claims, that logic does not hold after dismissal of the FEHA claims. From that point forward, all costs incurred by Hologic were exclusively the result of defending the non-FEHA causes of action.

We are not persuaded by Mallon's argument that an award of costs in these circumstances weakens private enforcement of employee antidiscrimination and tends to discourage potentially meritorious FEHA suits, because the trial court properly struck Hologic's request for costs for the entire portion of litigation during which Mallon's non-frivolous FEHA claims were at issue. In their joint stipulation, the parties appeared to have considered the possibility that the remaining, non-FEHA claims would be subject to a claim for fees or costs by expressly acknowledging that "[t]his [s]tipulation will not preclude Hologic from seeking or recovering costs as otherwise permitted by law if Hologic prevails on any of the [r]emaining [c]laims." Mallon argues that upholding a cost award under these circumstances creates a perverse incentive for a party to retain its FEHA claims as a cost shield, but Government Code section 12956(c)(6) addresses this by allowing a prevailing defendant to recover costs if "the court finds the action was frivolous, unreasonable, or groundless when brought, *or the plaintiff continued to litigate after it clearly became so*." (Italics added.)

We decide the trial court did not err in concluding that, just as Government Code section 12956(c)(6) would have been inapplicable if Mallon had brought only non-FEHA claims at the outset, it was inapplicable to the litigation that followed the dismissal of her FEHA claims. The general rules governing cost recovery pursuant to Code of Civil

---

[16] The trial court "studied the [f]irst and [s]econd [a]mended [c]omplaints to determine the overlap, if any, between" Mallon's FEHA and non-FEHA claims. It decided that based on the "identical conduct" alleged in support of the third cause of action for retaliation under FEHA and the whistleblower retaliation cause of action, as well as the overlap in "discovery and other litigation activity to defend" Mallon's FEHA-based claims, Hologic "would have incurred those same costs had [Mallon] brought only FEHA based claims" up until the dismissal of the FEHA claims.

Procedure section 1032(b) therefore governed Hologic's cost recovery after the September 2022 dismissal of Mallon's FEHA claims.[17]

Mallon contends the cost award should be further reduced because of the extreme financial hardship it imposes on Mallon. She maintains that the trial court erred in concluding that it lacked discretion to strike costs based on inability to pay and that she failed to support her claimed inability to pay with substantial evidence.

We are sympathetic to Mallon's position. However, she has not demonstrated error in the trial court's determination that it lacked discretion to consider financial hardship in awarding costs under Code of Civil Procedure section 1032(b). The statutory language is unambiguous that a prevailing party "is entitled as a matter of right to recover costs." (*Ibid.*) Appellate courts that have considered whether a trial court may consider a party's financial condition in awarding costs under the statute have held that inability to pay is not an authorized ground under Code of Civil Procedure section 1033.5 to reduce costs. (*LAOSD Asbestos Cases* (2018) 25 Cal.App.5th 1116, 1124–1125 (*LAOSD*) [noting no authority to support argument that the statutory language "allowing costs that are 'reasonable in amount' and 'reasonably necessary to the conduct of the litigation' also confers authority for the court to analyze whether costs are reasonable based on the losing party's ability to pay"]; *Nelson v. Anderson* (1999) 72 Cal.App.4th 111, 129 [holding that trial court's discretion to consider ability to pay costs under other statutory schemes does not create equivalent authority under Code of Civil Procedure sections 1032 and 1033.5].)

Because FEHA does not govern the cost award, Mallon's reliance on it (and related case authority) as the source of the trial court's discretion is unavailing. As our

---

[17] Having determined that the court did not err in applying Code of Civil Procedure section 1032(b) to Hologic's request for costs post-dismissal of the FEHA claims, we need not consider Hologic's alternate argument that Mallon's FEHA claims objectively lacked merit, thus supporting the cost award even if this court were to decide that the non-FEHA claims were intertwined with and inseparable from the FEHA claims.

high court explained in *Williams*, "By making a cost award discretionary rather than mandatory, Government Code section 12965(b) expressly excepts FEHA actions from Code of Civil Procedure section 1032(b)'s mandate for a cost award to the prevailing party." (*Williams*, *supra*, 61 Cal.4th at p. 105.) Given the discretion afforded trial courts in awarding costs under FEHA, it is unsurprising that appellate courts have deemed it appropriate to consider a party's financial condition to ensure that any award of attorney fees and costs does not thwart FEHA's public policy goals. (See, e.g., *Rosenman v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro* (2001) 91 Cal.App.4th 859, 868.) Absent statutory or persuasive case authority[18] indicating that courts may exercise similar discretion in ascertaining reasonable costs under the standards set forth in Code of Civil Procedure section 1033.5, subdivision (c)(3), we decline to presume that the prevailing party's entitlement to allowable costs may be reduced based on an alleged inability to pay.

Mallon asserts that the cost award is disproportionately large based on the timing of the stipulated dismissal, given the major part of the litigation occurred prior to the stipulated dismissal of FEHA claims subject to the motion to strike. Specifically, she asserts that "92 [percent]" of the litigation (measured as the time from case inception to the stipulated dismissal, in proportion to case inception to the grant of summary judgment) involved active FEHA claims; yet she contends the cost award of $26,615 constitutes nearly one-third of the total costs purportedly incurred by Hologic. Apart

---

[18] Although the *Roman* court referred to both FEHA and the general civil litigation cost provisions as authority for the trial court to exercise discretion "to deny or reduce a cost award to a prevailing FEHA defendant when a large award would impose undue hardship on the plaintiff" (*Roman*, *supra*, 237 Cal.App.4th at p. 1062 [citing Gov. Code, § 12965, former subd. (b) and Code Civ. Proc., § 1033.5, subd. (c)(3)]), we respectfully disagree. As stated in *LAOSD*, which squarely addressed whether the phrase " 'reasonable in amount' " under Code of Civil Procedure section 1033.5 confers authority on courts to consider financial hardship, the statutory language does not appear to support such a broad interpretation. (*LAOSD*, *supra*, 25 Cal.App.5th at pp. 1124–1125.)

from this broad criticism of the costs awarded as compared to the applicable portion of litigation, Mallon does not challenge the trial court's finding based on Hologic's evidentiary submissions in support of its memorandum of costs that the costs requested "were incurred and were all reasonably necessary to conduct the litigation." Nor has she attempted to identify on appeal which costs were erroneously attributed to the period following the September 2022 stipulation. Mallon has therefore forfeited any specific challenge to the amount of the cost award.

## III.  DISPOSITION

The judgment and order granting in part the motion to strike or tax costs are affirmed. In the interests of justice, the parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)

_____
Danner, J.

WE CONCUR:


_____
Greenwood, P. J.



_____
Grover, J.




**H050917, H051465**
*Mallon v. Hologic, Inc.*